IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


ANA L. ORTEGA                                              PLAINTIFF


          v.                    CIVIL NO. 17-2137


NANCY A. BERRYHILL,[1] Commissioner
Social Security Administration                             DEFENDANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Ana L. Ortega, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) benefits under the provisions of Titles II and XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).


**I.    Procedural Background:**

Plaintiff protectively filed her current applications for DIB and SSI on June 30, 2015, alleging an inability to work since June 25, 2015, due to right knee replacement, bilateral knee arthritis with pain, and difficulty standing and walking. (Tr. 253, 294, 314). For DIB

---

[1] Nancy A. Berryhill, has been appointed to serve as acting Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

purposes, Plaintiff maintained insured status through December 31, 2020.  (Tr. 48, 238).  An administrative hearing was held on August 30, 2016, at which Plaintiff appeared with counsel and testified with the assistance of a Spanish interpreter. (Tr. 71-88).

By written decision dated September 15, 2016, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 48-49).   Specifically, the ALJ found Plaintiff had the following severe impairments: reconstructive surgery of a weight bearing joint; arthritis in bilateral knees; carpal tunnel syndrome; and obesity. (Tr. 48).  However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Tr. 49-50).  The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she:  could occasionally handle and finger with her dominant, right upper extremity; and could frequently handle and finger with left upper extremity.

(Tr. 50-53).  With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a hostess, callout operator, and cafeteria attendant. (Tr. 54).  The vocational expert estimated that based on her experience, the number of hostess positions would be reduced by 50 percent; the number of callout operator positions would be reduced by 75 percent; and the number of cafeteria attendant positions would be reduced by 25 percent because Plaintiff was a Spanish speaker. (Tr. 54).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on July 12, 2017. (Tr. 1-9).  Subsequently, Plaintiff filed this

action.  (Doc. 1).  Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation.  (Docs. 17, 18).

The Court has reviewed the entire transcript.  The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    Evidence Presented:

At the time of the administrative hearing held on August 30, 2016, Plaintiff was forty years of age, and she had obtained a limited education at the seventh grade level in Mexico. (Tr. 75).  Plaintiff's past relevant work consists of work as a food assembler or food packager classified as a light level job, svp 3. (Tr. 53, 82-83).

A review of the pertinent medical evidence reflects the following.  On June 30, 2014, Plaintiff presented to Dr. Doreen Saltiel, M.D., a cardiologist, due to ongoing leg pain despite compression stocking use. (Tr. 346-348).  Dr. Saltiel diagnosed Plaintiff with varicose veins of the lower extremities with inflammation and other complications. (Tr. 346-348).  Plaintiff was to continue wearing compression stockings, and she was counseled about endovenous therapy. (Tr. 346-348).

On September 10, 2014, a right knee MRI study reflected significant osteoarthritis, particularly at the medial compartment where there was articular cartilage loss, subchondral signal abnormality, particularly at the femur, and early spur formation. (Tr. 430).  The study also showed milder cartilage loss at the medial facet of the patella and no obvious ligament or meniscal tear. (Tr. 430).

On October 2, 2014, Plaintiff presented to Dr. Brian Geoffrey Ogg, D.O., an orthopedic surgeon, for an initial visit. (Tr. 570-572). Plaintiff was diagnosed with moderate degenerative arthritic changes of both knees and asymptomatic of the right knee. (Tr. 570-572). Dr. Ogg recommended a patellofemoral tracking brace and physical therapy. (Tr. 570-572). Plaintiff started Meloxicam and Tramadol and stopped taking Indomethacin. (Tr. 570-572).

On October 15, 2014, a bilateral knee X-ray revealed moderate degenerative arthritic changes of both knees, asymptomatic of the right knee. (Tr. 357).

On October 30, 2014, Plaintiff presented to Dr. Ogg with osteoarthritis in both knees. (Tr. 353-354). Plaintiff also presented with a new complaint of bilateral hand numbness, tingling, and weakness. (Tr. 353-354). She reported she had been unable to work because of decreased grip strength and numbness, and woke up frequently with hand numbness and pain. (Tr. 353-354). Upon examination, Plaintiff had an antalgic gait and a limp favoring the right knee mostly, but otherwise normal strength and stance. (Tr. 353-354). Her knee joint exhibited mild joint effusion, exquisite medial joint tenderness, but negative McMurray's, Lachman's, pivot shift, and Hoffman's sign. (Tr. 353-354). She had normal strength in upper and lower extremities. (Tr. 353-354).

Examination of her hands revealed a positive Phalen's, but negative equivocal Tinel's of both wrists. (Tr. 353-354). Plaintiff had detected diminished sensibility of the thumb, index, and middle finger. (Tr. 353-354). Dr. Ogg noted she had normal sensation to little finger and ring finger, no triggering of the digits, nontender to wrist joint, normal supination and pronation, and elbow range of motion, and no restriction of wrist range of motion. (Tr. 353-354). Plaintiff was diagnosed with diffuse osteoarthritic changes of both knees with

4

predominantly patellofemoral complaints. (Tr. 353-354).  Dr. Ogg refilled Meloxicam and recommended cock-up wrist supports. (Tr. 353-354). An electromyogram (EMG) was ordered to check for carpal tunnel syndrome for both upper extremities. (Tr. 353-354).

On October 30, 2014, Plaintiff underwent a physical therapy evaluation due to bilateral knee pain, and the therapy was to last for two weeks with two sessions per week. (Tr. 480-488).

On December 4, 2014, Plaintiff reported to Dr. Ogg that her carpal tunnel complaints were mostly bothersome when she goes to work, and wearing braces at night helped her sleep. (Tr. 355-356).  Plaintiff admitted she stopped attending physical therapy because she felt therapy was hurting her knees more. (Tr. 355-356).  A right knee MRI study showed mild fissuring of the patella consistent with chondromalacia of the patella. (Tr. 355-356). She reported wearing a Breg PTO knee brace helped while she was working. (Tr. 355-356).

Upon examination, Plaintiff had a normal gait, stance, and strength of the lower extremity. (Tr. 355-356).  Dr. Ogg noted there was no joint effusion, her knee was stable to varus and valgus stress, and moderate patellofemoral apprehension and anterolateral discomfort locally with knee pain. (Tr. 355-356).  She had negative Lachman's and McMurray's, no pretibial edema, dorsalis pedis and posterior tibialis pulses were palpable, and intact light touch sensation. (Tr. 355-356).  Examination of Plaintiff's hands revealed no thenar wasting, equivocal Tinel's and positive Phalen's present bilaterally, light touch sensation of the fingers, and no triggering of the digits. (Tr. 355-356).  The EMG results were reviewed with Plaintiff, and it showed no evidence of carpal tunnel syndrome or cervical radiculopathy. (Tr. 355-356).

Dr. Ogg ultimately diagnosed her with chondromalacia of the patella, patellofemoral maltracking right knee and carpal tunnel syndrome which was clinically mild and without EMG evidence. (Tr. 355-356). Dr. Ogg administered a carpal tunnel injection of Dexamethasone Acetate and Lidocaine in the right arm. (Tr. 355-356). Plaintiff was instructed to continue wearing her brace and to do independent exercises. (Tr. 355-356). Dr. Ogg opined that he was convinced presently that surgical arthroscopy would not benefit her knee. (Tr. 355-356).

On January 6, 2015, Plaintiff presented to Dr. Jody Bradshaw, M.D., an orthopedic surgeon, with right knee pain. (Tr. 368-369). She reported it was moderate to severe pain with worsening the longer she was on her feet. (Tr. 368-369). A right knee X-ray showed narrowing of the medial compartment with medial osteophyte. (Tr. 368-369). A right knee MRI study revealed significant wear along the medial compartment, lateral side was well maintained, and mild wear underneath the patella. (Tr. 368-369). Dr. Bradshaw diagnosed Plaintiff with right knee osteoarthritis, mostly focused on the medial compartment. (Tr. 368-369). Dr. Bradshaw administered a Decadron and Lidocaine injection into her anterior lateral right knee for treatment. (Tr. 368-369). Plaintiff's Meloxicam was discontinued and Diclofenac was started. (Tr. 368-369).

On February 26, 2015, Plaintiff reported the previous injection administered in January helped for two weeks. (Tr. 366). Dr. Bradshaw diagnosed her with right knee medial sided osteoarthritis and recommended a medial unloading brace. (Tr. 366).

On April 23, 2015, Dr. Bradshaw diagnosed her with right knee osteoarthritis and recommended a viscosupplementation injection. (Tr. 364).

6

On April 28, 2015, bilateral hand X-rays showed mild degenerative change at the base of the distal phalanx of the first right digit. (Tr. 429).

On June 10, 2015, Dr. Bradshaw noted because Plaintiff was only 39 years old, she was not an ideal candidate for arthroplasty. (Tr. 362). However, despite different anti-inflammatory medicines, exercises, and therapy, her pain continued. (Tr. 362). Upon examination, her right knee showed no effusion or erythema, her motion was 0-130, and had stable varus and valgus stress. (Tr. 362). She was very tender along medial joint line, laterally and along lateral facet of patella, pain with patellar compression, and had warm well perfused feet. (Tr. 362). A right knee X-ray showed arthritic change with osteophyte formation in the medial and lateral compartment and joint space narrowing. (Tr. 362). Dr. Bradshaw reluctantly recommended a total knee replacement. (Tr. 362).

The medical evidence continues after the alleged onset date of June 25, 2015. From June 26, 2015 to June 29, 2015, Plaintiff was admitted to Mercy Hospital to undergo a right total knee arthroplasty performed by Dr. Bradshaw. (Tr. 434-448). On June 26, 2015, Dr. Bradshaw advised Plaintiff that at her age of 39 years old a knee replacement had the potential to "wear out," and it may have to be revised over the course of her lifetime. (Tr. 462-463). Plaintiff wanted to proceed with the surgery. (Tr. 462-463). Dr. Bradshaw diagnosed her with right knee osteoarthritis, and performed a right total knee arthroplasty. (Tr. 465-468). Three days later, she was discharged from the hospital. (Tr. 468-471).

On July 8, 2015, a right knee X-ray revealed right total knee arthroplasty, and probable joint effusion with some calcific material anteriorly with some debris in the joint that may be present. (Tr. 372, 494).

On August 13, 2015, Plaintiff was discharged from the physical therapy that was ordered after her knee surgery. (Tr. 495-497). She was discharged ambulatory without use of an assistive device within her household, and she used a cane for outdoor mobility. (Tr. 495-497). She had a good prognosis in maintaining functional mobility. (Tr. 495-497).

On December 14, 2015, non-examining consultant, Dr. Clarence Ballard, M.D., completed a Physical RFC Assessment at the initial level. (Tr. 91-108). Dr. Ballard found that the records supported a light RFC with no limitations. (Tr. 91-108). On February 19, 2016, Dr. William Harrison, M.D. concurred with Dr. Ballard's physical RFC assessment upon reconsideration. (Tr. 111-134).

On December 30, 2015, Ms. Kelly Hubbard, A.P.N. diagnosed Plaintiff with knee joint pain, and referred her for an orthopedic evaluation. (Tr. 538-539).

On January 12, 2016, Plaintiff presented to Ms. Hubbard with pain in both knees, and pain was mildly improved with Meloxicam. (Tr. 537-538). In regards to her hypertension and hypothyroidism, she reported feeling much better since restarting medications. (Tr. 537-538). Plaintiff was diagnosed with hypothyroidism, osteoarthritis, hypertension, nausea, direct epigastric tenderness, direct tenderness in the right upper quadrant of the abdomen, and nonspecific abnormal hematology findings. (Tr. 537-538).

On January 20, 2016, presented to Dr. Timothy J. Garlow, M.D., an orthopedic surgeon, for an initial visit due to continued right knee pain. (Tr. 546-547). Plaintiff was seven months post right knee arthroplasty, and Dr. Garlow found she had laxity and instability. (Tr. 546-547). Dr. Garlow opined that converting Plaintiff to a thicker poly and maybe even a stabilizing deep dish variety could potentially benefit her. (Tr. 546-547).

On January 26, 2016, a bone scan showed increased uptake in the right knee joint, no increased flow uptake so not positive on all three phases. (Tr. 531-535). It was possible there could still be some uptake to surgery that was seven months prior. (Tr. 531-535). Finding were nonspecific, and warranted an arthrogram if desired. (Tr. 531-535). There was also delayed uptake in the left knee consistent with degenerative exchange there as well. (Tr. 531-535).

On February 5, 2016, Plaintiff presented to Dr. Garlow, and he noted the inflammatory markers were negative with an erythrocyte sedimentation rate of 16 and C-reactive protein of less than four. (Tr. 549-550). Plaintiff's bone scan showed some changes likely secondary to her surgery seven months ago. (Tr. 549-550). Dr. Garlow acknowledged Plaintiff's instability post surgery and pain, and recommended a slight medial release and upsizing her poly to obtain stability and improve her pain. (Tr. 549-550).

From March 15, 2016 to March 17, 2016, Plaintiff was admitted to Mercy Hospital to undergo a right knee arthroplasty revision surgery. (Tr. 610-626). Dr. Garlow diagnosed Plaintiff with a painful and unstable right total knee arthroplasty, and performed a revision, right knee arthroplasty, poly only. (Tr. 610-613). In addition, a femoral nerve block for postoperative pain management was performed at Dr. Garlow's request. (Tr. 610-613).

On April 1, 2016, Dr. Garlow noted during Plaintiff's follow up visit two weeks later that she was doing well. (Tr. 589-590). Dr. Garlow recommended physical therapy that was met with resistance from the Plaintiff. (Tr. 589-590).

On April 29, 2016, Plaintiff returned for a six week follow up visit. (Tr. 592-593). Upon examination, the right knee had full extension, flexed up to 120 degrees, incision was benign, no effusion, and some irritability of the knee with motion. (Tr. 592-593). A right

knee X-ray showed components were unchanged, posterior stabilized Stryker, and no evidence of loosening, subsidence, or other abnormality. (Tr. 592-593). Dr. Garlow noted that clinically everything looked excellent, and he encouraged Plaintiff to be patient with her recovery. (Tr. 592-593).

On June 13, 2016, Plaintiff presented to Dr. Garlow for a six month follow up visit. (Tr. 595-596). Plaintiff reported her pain was definitely improving, and she did not have the same sense of instability that she had before and was overall pleased. (Tr. 595-596). Upon examination, the right knee had full extension, flexed up beyond 120 degrees, incision was benign, and no coronal plane instability at this point. (Tr. 595-596). A right knee X-ray showed components were unchanged and appeared to be well positioned, and no evidence of loosening, subsidence, or other abnormality. (Tr. 595-596). Dr. Garlow noted Plaintiff was doing well. (Tr. 595-596).

On June 17, 2016, Plaintiff presented to Ms. Hubbard for a thyroid follow up and left side pain. (Tr. 649-651). Plaintiff also reported sudden severe chest pain and headaches. (Tr. 649-651). Plaintiff was diagnosed with hypothyroidism, chest pain or discomfort, headache, and splinter of ear. (Tr. 649-651). A chest X-ray revealed no acute disease evident. (Tr. 663). Ms. Hubbard referred Plaintiff to a cardiologist. (Tr. 649-651).

On July 7, 2016, Plaintiff presented to Dr. Julio Schwarz, M.D., a cardiologist, and reported sharp left chest pain that was non-radiating and dyspnea for the last two months. (Tr. 634-645). Upon examination she was 5'4" tall, weighed 191 pounds, and had a body mass index of 32.77. (Tr. 634-645). An electrocardiogram (EKG) showed normal sinus rhythm, low voltage, left atrial abnormality, poor R wave progression from V1 through V3, and nonspecific St-T wave changes. (Tr. 634-645). Dr. Schwarz diagnosed her with

precordial chest pain, dyspnea, dyspnea on exertion, abnormal EKG, hypertension, family history of coronary artery disease, obesity, chronic renal insufficiency of unclear etiology, and arthritis status post right knee replacement. (Tr. 634-645). Dr. Schwarz recommended proceeding with a myocardial perfusion imaging study using pharmacological stimulation given her dyspnea and right knee impairment, rule out underlying ischemia. (Tr. 634-645). Dr. Schwarz also ordered a two-dimensional echocardiographic Doppler study. (Tr. 634-645). Plaintiff was scheduled for a myocardial perfusion imaging scan on July 25, 2016, and EKG and nuclear stress test on September 19, 2016. (Tr. 642-643).

On August 24, 2016, a right hand X-ray revealed mild osteoarthritis of the right thumb. (Tr. 661). In addition, a pelvis X-ray showed minimal arthritic change in hips and no fracture. (Tr. 662).

The medical evidence continues after the administrative hearing date of August 30, 2016. On January 25, 2017, Plaintiff returned for a post-operative visit with Dr. Garlow. (Tr. 13-15, 25-26). Plaintiff reported achiness in her knee. (Tr. 13-15, 25-26). Plaintiff also had pain in her left knee, and when Dr. Garlow injected at the last visit, she had some short term relief. (Tr. 13-15, 25-26). Plaintiff reported during this visit that he has had multiple joints aching, hip pain, knee pain, and has had a harder time leaving the house. (Tr. 13-15, 25-26).

Upon examination, there was no significant synovitis of the metacarpal phalangeal joint, but she does have some fullness of the interphalangeal joints of the thumb. (Tr. 13-15, 25-26). In regards to her knees, there were no effusions, the right knee has full motion, no coronal plane instability and seems to function well though just some overall achiness. (Tr. 13-15, 25-26). The left knee was without effusion and just had achiness throughout. (Tr. 13-15, 25-26).

11

Dr. Garlow diagnosed Plaintiff with a history of right knee arthroplasty and revision with some persistent pain. (Tr. 13-15, 25-26). Plaintiff also had some left knee pain and pain throughout her body. (Tr. 13-15, 25-26). Dr. Garlow ordered laboratory testing to check for an underlying rheumatologic condition. (Tr. 13-15, 25-26).

On February 1, 2017, Dr. Garlow diagnosed Plaintiff with rheumatoid arthritis involving multiple sites and unspecified rheumatoid factor presence. (Tr. 16-25).

On March 15, 2017, Plaintiff returned to Dr. Garlow for a follow up visit one year after revision surgery. (Tr. 27-28). Plaintiff reported some pain and left knee pain as well. (Tr. 27-28). Dr. Garlow referred Plaintiff to rheumatology due to inflammatory markers that indicated underlying inflammatory arthritis. (Tr. 27-28). Upon examination, Plaintiff's right lower extremity had good stability in the coronal and sagittal planes throughout the arc of motion, benign incision, and motion was full. (Tr. 27-28). A right knee X-ray showed stabilized components with neutral alignment, and no evidence of loosening, fracture, subsidence, or other failure. (Tr. 27-28). Dr. Garlow diagnosed her with status post revision of right knee arthroscopy and rheumatoid arthritis. (Tr. 27-28). Dr. Garlow noted she was doing well, and because of achy pains in her knee and joints, he felt the greatest overall benefit would be for her to see a rheumatologist. (Tr. 27-28).

On May 2, 2017 and May 15, 2017, Plaintiff was diagnosed with arthralgia of multiple sites, high risk medication use, hypertension, hypothyroidism, fatigue, pain in both hands, and rheumatoid arthritis involving both hands with positive rheumatoid factor. (Tr. 10-12).

### III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § § 423(d)(1)(A), 1382c (a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382(3)(C).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §§ 404.1520, 416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity.  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.


**IV.    Discussion:**

Plaintiff raises the following issues on appeal: 1) Whether the ALJ erred in his RFC determination; and 2) Whether the ALJ erred in assessing Plaintiff's subjective complaints and the credibility analysis. (Doc. 17).

**A.    RFC Determination:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).

The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id. In determining that Plaintiff maintained the RFC to perform light work except she could occasionally handle and finger with her dominant, right upper extremity; and could frequently handle and finger with left upper extremity, the ALJ considered the medical assessments of the non-examining agency medical consultants; Plaintiff's subjective complaints; and her medical records. (Tr. 50).

Plaintiff contends the ALJ should have found a more restrictive RFC because of her varicose veins of lower extremities with inflammation; mild carpal tunnel syndrome; dyspnea; abnormal EKG; gait difficulty; and diffuse osteoarthritic changes of bilateral knees. (Doc. 17). The undersigned finds the record does not support Plaintiff's argument, and the ALJ's RFC determination was supported by substantial evidence.

The Plaintiff did not allege disability due to varicose veins, and the only evidence regarding this diagnosis occurred a year prior to the alleged onset date. (Tr. 346-348). Dr. Saltiel diagnosed Plaintiff with varicose veins of the lower extremities with inflammation and other complications, and her treatment consisted of wearing compression stockings. (Tr. 346-348). Plaintiff was counseled about endovenous therapy, but there is no other evidence in the record about further treatment.

Additionally, Plaintiff acknowledged her carpal tunnel syndrome was mild, and the record concurred. (Doc. 17).  On October 30, 2014, Dr. Ogg's examination of her hands revealed a positive Phalen's, but negative equivocal Tinel's of both wrists. (Tr. 353-354). Plaintiff had detected diminished sensibility of the thumb, index, and middle finger, but normal sensation to little finger and ring finger. (Tr. 353-354).  Plaintiff had no triggering of the digits; nontender to wrist joint; normal supination, pronation, and elbow range of motion; and no restriction of wrist range of motion. (Tr. 353-354).  Dr. Ogg recommended conservative treatment of Meloxicam and cock-up wrist supports. (Tr. 353-354).

Shortly thereafter on December 4 2014, Plaintiff reported that she continued working despite this impairment, and wearing the wrist braces at night helped her sleep. (Tr. 355-356).  Significantly, EMG results showed no evidence of carpal tunnel syndrome or cervical radiculopathy. (Tr. 355-356).  Dr. Ogg ultimately diagnosed her with carpal tunnel syndrome which was clinically mild and without EMG evidence. (Tr. 355-356). Dr. Ogg also administered an injection of Dexamethasone Acetate and Lidocaine in the right arm, and this is the only further treatment submitted into the record regarding this impairment. (Tr. 355-356).  There is no evidence or discussion of further treatment such as a carpal tunnel release in the record.  Thus, the record does not support additional limitations beyond those presented in the ALJ's RFC determination due to Plaintiff's mild carpal tunnel syndrome.

The undersigned agrees with the ALJ's determination that Plaintiff's chest pain was a non-severe impairment. (Tr. 49).  The ALJ found it was a recent complaint that did not meet the durational requirement to be considered a severe impairment. (Tr. 49); See 20 C.F.R. §§ 404.1505(a), 416.905(a).  In addition, objective testing supported his finding because a chest X-ray found no acute disease, and an EKG showed normal sinus rhythm. (Tr. 49, 634-645,

663).   Furthermore, Dr. Schwarz, a cardiologist, diagnosed Plaintiff with precordial chest pain, dyspnea, dyspnea on exertion, and an abnormal EKG on July 7, 2016. (Tr. 634-635). Dr. Schwarz recommended further testing, including a myocardial perfusion imaging study and an echocardiographic Doppler study, but there was no evidence that Plaintiff underwent such testing or results from the testing. (Tr. 634-645).   The lack of additional testing or treatment supported not limiting the RFC determination further due to these impairments.

Furthermore, the record does not support any additional limitations from Plaintiff's osteoarthritic changes of the bilateral knees and gait difficulty.   Dr. Bradshaw performed a right total knee arthroplasty on June 26, 2015, but due to continued pain and instability, Dr. Garlow proceeded with a right knee arthroplasty revision surgery on March 15, 2016. (Tr. 465-468, 610-613).   Plaintiff also received a femoral nerve block for pain management and underwent physical therapy. (Tr. 495-497, 610-613).

The ALJ noted that subsequent X-rays were unremarkable and physical examinations were normal, including Plaintiff's gait and stance. (Tr. 51-52, 592, 595, 628, 636, 650). Although Plaintiff used a cane to ambulate, the ALJ determined it was not prescribed by her physician, and she was advised to stop using it. (Tr. 52).   Additionally, Plaintiff had few subsequent complaints concerning her knee pain, and she admittedly did not have the same feelings of instability she had prior to the revision surgery. (Tr. 52, 589).   The ALJ acknowledged that the record did not contain an opinion from Plaintiff's physicians or surgeons recommending any functional limitations. (Tr. 52).   The undersigned finds that because the Plaintiff's knee symptoms significantly improved due to the revision surgery, the ALJ's RFC determination did not require further restrictions beyond light work with limitations.

State agency assessments were the only opinions presented in the record, and their assessment were for the full range of light work. (Tr. 91-108, 111-134).  The ALJ assigned substantial weight to the opinions of Drs. Ballard and Harrison because they reviewed the record; were familiar with Social Security regulations and functional assessments; and their opinions were consistent with the evidence as a whole, specifically Plaintiff's activities of daily living and the treatment records. (Tr. 53).  The ALJ found that the state agency consultants did not take into consideration Plaintiff's severe right hand pain, and therefore the ALJ factored it into his RFC determination. (Tr. 53).

Neither Social Security regulations nor Eighth Circuit case law dictate that an ALJ must obtain an RFC assessment from a treating source in order for the record to be complete. See Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007); 20 C.F.R. § 404.1546(c). Additionally, because the RFC is an administrative finding reserved to the ALJ, the law does not require a medical professional to opine on the Plaintiff's ability to perform work related activities in order for the record to be complete.  See Perks v. Astrue, 687 F.3d 1086, 1092 (8th Cir. 2012) (claimant has burden of establishing RFC; while RFC assessment draws from medical sources for support and must be supported by some medical evidence, it is ultimately an administrative determination).  The undersigned finds there is sufficient evidence in the record to support the ALJ's RFC determination.

Plaintiff also contended she had mental limitations including problems with concentration, persistence, and pace. (Doc. 17).  This argument is without merit because the record did not show a diagnosed mental impairment, and Plaintiff did not allege a mental impairment as a basis for disability.  In addition, there was no evidence of a treating physician or consultative examiner that provided an opinion as to Plaintiff's mental RFC.

Based upon the foregoing, the undersigned finds Plaintiff does not have limitations beyond the scope of the ALJ's RFC, and there is substantial evidence to support the determination.

**B.      Subjective Complaints and Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly considered and Plaintiff's subjective complaints and provided a proper credibility analysis.  Plaintiff argues the ALJ's credibility determination did not contain specific reasons why she was discredited, and the ALJ did not follow the guidelines of set forth in Polaski. (Doc. 17).  Although there is not a defined section in the decision that addresses credibility, the ALJ provided good reasons throughout the decision for finding Plaintiff's subjective complaints not entirely credible.  The ALJ also expressly acknowledged Plaintiff suffers with some degree of pain due to her impairments, and the ALJ considered her pain when he formulated the RFC determination. (Tr. 52-53).

While the record reveals that Plaintiff has a history of right knee pain, the ALJ considered the effectiveness of her most recent treatment. See Guilliams, 393 F.3d at 802 (evidence of effective treatment may diminish the credibility of a claimant's complaints). Evidence in the record indicated her symptoms improved after the revision surgery and femoral nerve block administered for pain management. (Tr. 13-28, 589-593, 595-596, 610-626). The ALJ noted that objective imaging after the second right knee surgery was unremarkable, and Plaintiff had few subsequent complaints concerning her knee pain. (Tr. 52). In fact, Plaintiff reported her pain was definitely improving, she did not have the same sense of instability that she had before, and Plaintiff was pleased overall. (Tr. 595-596).

The ALJ noted although Plaintiff used a cane to ambulate, it was not prescribed by a physician, and she admitted at the hearing her doctor told her to stop using the cane in order to see if she could walk better without it. (Tr. 52, 80). Plaintiff testified that Meloxicam and Tramadol were not effective in treating her pain, but there is no evidence in the record to support the allegations of their ineffectiveness. (Tr. 79-80).

Although there is evidence after the hearing date that Plaintiff had some bilateral knee pain due to a new diagnosis of rheumatoid arthritis, the durational requirement had not been met. (Tr. 10-28); See 20 C.F.R. §§ 404.1505(a), 416.905(a). Dr. Garlow noted she was doing well post revision surgery, but because of achy pains in her knee and joints, he referred her to a rheumatologist. (Tr. 27-28). However, there is no submitted evidence of a rheumatologist office visit.

The ALJ is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. See Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995) ("reversal due to failure to develop the record is only warranted where such failure is

unfair or prejudicial").  The undersigned finds that other evidence in the record, including Plaintiff's own statements, constituted evidence regarding Plaintiff's physical limitations and that the existing medical sources contained sufficient evidence for the ALJ to make a determination regarding Plaintiff's alleged physical impairments.  In addition, given that none of Plaintiff's surgeons or medical providers reported functional or work related limitations, there was a basis to question her credibility. (Tr. 52); See Eichelberger v. Barnhart, 390 F.3d 584, (8th Cir. 2004).

Additionally, the opinion evidence from state agency medical consultants, Drs. Ballard and Harrison, finding that Plaintiff could perform light work does not support Plaintiff's allegations of disabling pain. (Tr. 91-108, 111-134).  Although Plaintiff contends the ALJ did not evaluate side effects from medication, there is no evidence in the record to support side effects or changes in medication due to side effects.

In the decision, the ALJ evaluated Plaintiff's activities of daily living and found the activities were not as limited as one would expect given her allegations of disabling pain. (Tr. 52-53).  The ALJ noted in the first function report completed prior to Plaintiff's revision surgery, she reported no problems with personal care; she prepared daily meals which took her between 30 minutes to one hour to prepare; and she was able to do some household chores with some assistance from her husband. (Tr. 52-53, 271-278).  Plaintiff also completed a second function report just two months before the revision surgery performed on March 15, 2016. (Tr. 301-308).  Although Plaintiff reported more limitations with her activities of daily living, subsequent evidence regarding the effectiveness of the surgery supported the finding that Plaintiff could work in some capacity. (Tr. 301-308).

Based upon the foregoing, as well as for those reasons given in Defendant's well stated brief, the undersigned believes there is substantial evidence to support the ALJ's credibility analysis and discounting Plaintiff's subjective complaints.

**V.      Conclusion:**

Based on the foregoing, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 13th day of April, 2018.


/s/  *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE